## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

PIONEER AGGREGATES, Inc., and  :
THE FAMOUS BRANDS, Inc.,        :
d/b/a SIMPSON SOLUTIONS         :
                               :
      **Plaintiffs**    :
                               :
  v.                          :    **3:11-cv-00325**
                               :    **(JUDGE MARIANI)**
THE PENNSYLVANIA DEPARTMENT     :
OF ENVIRONMENTAL PROTECTION,    :
*et al.*                        :
                               :
      **Defendants**    :

## MEMORANDUM OPINION

Presently before the Court is a motion to dismiss Counts I through VII of Plaintiffs'

Complaint (Doc. 9) filed by Defendants Pennsylvania Department of Environmental

Protection ("PADEP"), John Hanger, Keith Brady, Thomas Callaghan, Nathan Houtz,

Michael Menghini and Michael Kutney (collectively "Defendants") pursuant to Rules 12(b)(1)

and 12(b)(6) of the Federal Rules of Civil Procedure for lack of jurisdiction and for failure to

state a claim upon which relief may be granted.   Plaintiffs Pioneer Aggregates, Inc.

("Pioneer") and The Famous Brands, Inc., d/b/a Simpson Solutions' (collectively "Plaintiffs"),

allege multiple violations of their Constitutional rights as well as violations of various state

and federal statutes and seek damages, attorney's fees, costs, and declaratory relief.

## JURISDICTION

This matter is properly before the Court based upon federal question jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The Court will accept as true all of the well-pleaded facts in Plaintiffs' Complaint, drawing all reasonable inferences in favor of Plaintiffs as the non-moving parties. The pertinent facts are as follows:

Since 1991, Pioneer has operated a noncoal quarry mine in Laflin, Pennsylvania where it produces crushed stone-type material. (Pls.' Compl. at ¶¶ 85-86.) As part of its mining activities, Pioneer is required to obtain various permits from the PADEP and/or its Bureau of Mining. (Pls.' Compl. at ¶ 12.) In 2007, the Bureau of Mining issued Pioneer a revised permit to change its existing Surface Mining Permit ("SMP") to a noncoal permit with an option for reclamation of the mine utilizing clean fill on the condition that such clean fill follow the Bureau of Mining guidelines ("Clean Fill Approval Condition"). (Pls.' Compl. at ¶¶ 87-89.)

Operating under a joint venture with Simpson Solutions ("Simpson"), Pioneer and Simpson spent substantial sums to identify, secure, transport, and accept clean fill in anticipation of reclaiming the Laflin facility. (Pls.' Compl. at ¶¶ 94 and 97.) Sometime prior to September 2008, Pioneer and Simpson identified the Manhattan-based Willis Avenue Bridge Project ("WABP") as a source for clean fill on "an enormous scale." (Pls.' Compl. at

2

¶¶ 98 and 99.) In preparation for submitting a minor SMP revision application ("Source

Approval Request") with the Bureau of Mining, Pioneer began testing on the proposed

WABP fill to demonstrate that it constituted "clean fill" pursuant to the Clean Fill Approval

Condition. (Pls.' Compl. at ¶¶ 100 and 103.)

Pioneer submitted its Source Approval Request including the analytical data and test

results from the WABP fill which allegedly demonstrated that the fill was clean and thus

appropriate for mining reclamation. (Pls.' Compl. at ¶ 105.)  In doing so, Pioneer relied on

the requirements of the Bureau of Waste's "Waste Clean Fill" policy because it was the only

PADEP clean fill definition Pioneer knew existed. (Pls.' Compl. at  ¶ 104.)  Under this

policy, users of clean fill need to file a certification that the material has been determined to

be "clean fill" and retain documentation of test results demonstrating the fill is clean, if

testing was required. (Pls.' Compl. at ¶ 73.)

Defendants' asserted standard for determining whether material constitutes "clean

fill" is different and documented in Draft Technical Guidance No. 563-2000-301, titled, "Use

of Mine Reclamation Clean Fill at Active Mine Sites" ("Mining Clean Fill Standard"). (Pls.'

Compl. at ¶ 41.)  The Mining Clean Fill Standard defines "clean fill" as:

> Uncontaminated, non-water soluble, non-decomposable inert solid material
> obtained from an off-site source and used by the operator as fill material
> when performing reclamation at an active mine site . . . . "Uncontaminated,"
> as used here, means that the fill material does not contain regulated
> substances in concentrations exceeding the concentration levels specified in
> Tables 1 and 2 ... (Pls.' Compl. at ¶ 43.)

Also included within the document are parameters and requirements whose application is contingent on whether the clean fill sought is for incidental mine reclamation or standard mine reclamation. For example, "'Incidental Mine Reclamation Clean Fill' may not originate from an out-of-state source because of PADEP's limited ability to inspect and evaluate out-of-state areas" while "Standard Mine Reclamation Fill" may only use materials listed as acceptable and depends on whether the fill is placed "above the groundwater table or below the groundwater table."[1] (Pls.' Compl. at ¶ 44.)

Plaintiffs assert that the Mining Clean Fill standard has never been promulgated and approved as a regulation nor has it ever been submitted to the Legislative Reference Bureau for filing and publication in the Pennsylvania Bulletin and Pennsylvania Code. (Pls.' Compl. at ¶¶ 45 and 46.) Furthermore, Plaintiffs allege that Defendants rely upon the Mining Clean Fill standard when granting or denying permit applications despite the fact that it has never been developed, approved, and/or distributed pursuant to PADEP's Policy for Development and Publication of Technical Guidance . (Pls.' Compl. at ¶¶ 47 and 48.)

After determining that Pioneer's Source Approval Request was complete, Environmental Group Manager Nathan Houtz assigned it to permit reviewer Michael Kutney for review. (Pls.' Compl. at ¶ 106.) On November 26, 2008, Kutney sent Pioneer a letter that identified purported "technical deficiencies" in Pioneer's request and asked Pioneer to

---

[1] Plaintiffs admit that the incidental clean fill typically means "750 tons/year or less of clean fill material" and therefore does not apply to Plaintiffs' Source Approval Request because the request sought more than 750 tons. (Pls.' Memo. Of Law in Opp. To Defs.' Mot. To Dismiss at 5 n. 4.)

provide additional information including "PID readings" and a "map showing locations and depths for each individual grab sample." (Pls.' Compl. at ¶¶ 111-113.) Kutney later admitted that he was unsure whether this information was required by the Mining Clean Fill standard. (Pls.' Compl. at ¶ 114.) Sometime thereafter, PADEP's Kutney, Houtz, and Thomas Callahan reviewed the Source Approval Request and decided that it should be denied. (Pls.' Compl. at ¶¶ 119 and 120.) Houtz notified Pioneer about its denial in a letter stating that the soil and groundwater at the WABP was "extensively contaminated with metals and petroleum hydrocarbons" and there was no way to prove with any real certainty that the fill was uncontaminated. (Pls.' Compl. at ¶ 122.)

Pioneer submitted additional reports to Defendants reflecting that the WABP clean fill complied even with the non-binding draft standard. (Pls.' Compl. at ¶ 135.) Plaintiffs assert that the WABP fill was clean by the Mining Clean Fill standard and that Defendants based their decision not on the WABP fill, but on material near the fill site as having possibly contaminated the WABP fill. (Pls.' Compl. at ¶¶ 126 and 129.)

On March 23, 2009, Pioneer timely appealed Defendants' decision denying Pioneer's Source Approval Request to the Pennsylvania Environmental Hearing Board. (Pls.' Compl. at ¶ 137.) At a September 9, 2009 meeting to discuss Pioneer's Source Approval Request, Defendants stated they were not comfortable approving the WABP as a clean fill source because Defendants were not going to approve anything that they could not physically inspect. (Pls.' Compl. at ¶ 140 and 142.)

By April 26, 2010, an inactive mine in Coplay, Pennsylvania applied to the PADEP

Bureau of Waste to have the WABP fill placed in their mine. (Pls.' Compl. at ¶¶ 144 and

148.) As part of the approval process, the Coplay Facility submitted a request for approval

of the WABP to the Bureau of Waste, which determined that the material met the Waste

Clean Fill policy's definition of "clean fill," and thus approved the request. (Pls.' Compl. at ¶

148.) Pioneer ceased its appeal when it learned that the WABP fill that was the subject of

Pioneer's Source Approval Request was placed in the Coplay Facility and was no longer

available. (Pls.' Compl. at ¶ 144.)

## STANDARD

This matter is presented to the district court as a motion to dismiss. In light of the

Supreme Court's decisions in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 433 (2007), and

*Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009), the Middle District of Pennsylvania has adopted

the following standard by which to treat motions to dismiss. "[T]o survive a motion to

dismiss, a complaint must contain sufficient factual matter, accepted as true to 'state a claim

that relief is plausible on its face." *Iqbal*, 129 S.Ct. at 1949 (*citing Twombly*, 550 U.S. at

570). In *Iqbal*, the Court emphasized that "only a complaint that states a plausible claim for

relief survives a motion to dismiss." *Id*. at 1950. Furthermore, "[d]etermining whether a

complaint states a plausible claim for relief will ... be a context-specific task that requires the

reviewing court to draw on its judicial experience and common sense." *Id*. (citation omitted);

*McTernan v. City of York*, 577 F.3d 521, 530 (3d Cir. 2009).

District courts confronted by a motion to dismiss should engage in a two-step analysis. First, the district court should accept all well-pleaded facts as true, but may reject mere legal conclusions. Second, the district court should then determine whether the facts, as asserted, establish a "plausible claim for relief." *Iqbal*, 129 S.Ct. at 1950. Thus, a complaint must "show" an entitlement to relief with facts, as a mere allegation that a plaintiff is entitled to relief is insufficient to withstand a motion to dismiss. *See Philips v. Co. of Allegheny*, 515 F.3d 224, 234-35 (3d Cir. 2008). As the Supreme Court instructed in *Iqbal*, "[w]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – that the pleader is entitled to relief." *Iqbal*, 129 S.Ct. at 1949.

## DISCUSSION

Defendants' Motion to Dismiss (Doc. 9) is predicated upon several questions of law, which, in light of the allegations of Plaintiffs' Complaint, must be accepted as true for purposes of determining its legal sufficiency, thus rendering the matter ripe for disposition. Accordingly, the Court's analysis proceeds upon matters of Constitutional rights as well as various state and federal statutes.

## I. ELEVENTH AMENDMENT IMMUNITY

Defendants claim that both the PADEP and the individually named defendants are immune from suit in their official and personal capacities and that Plaintiffs' Complaint should be dismissed for lack of jurisdiction. (Defs.' Mem. Of Law in Support of Mot. To

Dismiss at 3.) Plaintiffs argue that the state officials named in the Complaint are not immune from suit in their official and personal capacities.

The Eleventh Amendment bars suits in federal court against states and state agencies. See Idaho v. Coeur d'Alene Tribe of Idaho, 521 U.S. 261 (1997). "[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit against the State itself." McCauley v. Univ. of the Virgin Islands, 618 F.3d 232, 241 (3d Cir. 2010) (citing Will v. Mich. Dep't of State Police, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989)) (internal citations and quotation marks omitted). The Pennsylvania Department of Environmental Protection is an agency of the Commonwealth. See Act of April 9, 1929, P.L. 177, art. II, § 201, as amended, 71 P.S. § 61; Oley Twp. v. Delaware River Basin Comm'n, 906 F. Supp. 284, 286 (E.D. Pa. 1995) (finding that PADEP is an agency of the Commonwealth of Pennsylvania).

There are three exceptions to Eleventh Amendment immunity. First, Congress may abrogate Eleventh Amendment immunity by expressing its "unequivocal" intent to abrogate pursuant to a "valid exercise of power." Seminole Tribe of Florida v. Florida, 517 U.S. 44, 55, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). Second, states may waive their sovereign immunity and consent to be sued. See M&M Stone Co. v. Pa. Dep't of Envtl. Prot., No. 07-4784, 2008 U.S. Dist. LEXIS 76050, at *43 (E.D. Pa. Sept. 29, 2008) (citing Alden v. Maine, 527 U.S. 706, 755 (1999)). Pennsylvania has not waived its sovereign immunity. 42 Pa.

C.S.A. § 8521(b); 1 Pa. C.S.A. § 2310. Finally, there is the *Ex parte Young* doctrine which allows suits against individual state officers for declaratory and prospective injunctive relief to remedy ongoing violations of federal law. 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908). However, the Third Circuit has expressly stated that *Ex parte Young* does not apply where the targeted subject of a petition for prospective injunctive relief is the government itself, but rather it narrowly applies to the individually named government agents. *See Koslow v. Commonwealth of Pennsylvania,* 302 F.3d 161, 178 (3d Cir. 2002) (Eleventh Amendment "has not been interpreted to bar a plaintiff's ability to seek prospective relief against state officials for violations of federal law"); *Pennsylvania Federation of Sportsmen's Clubs, Inc. v. Hess,* 297 F.3d 310, 325 (3d Cir. 2002) (finding that individuals working for the Office of Surface Mining and Reclamation enjoyed sovereign immunity).

Since Defendant PADEP is a state agency and has not waived its sovereign immunity, none of Plaintiffs' claims against Defendant PADEP can proceed in federal court. Accordingly, Plaintiffs' claims against Defendant PADEP must be dismissed.

This same sovereign immunity extends to all other DEP defendants in their official capacities with respect to Plaintiffs' claims for damages. However, to the extent that Plaintiffs seek prospective injunctive relief, Plaintiffs' federal claims against Defendant PADEP's state officials in their individual capacities may proceed. *See Ex Parte Young, supra,* at 166; *Koslow, supra,* at 179.

## II. CONSTITUTIONAL CLAIMS AGAINST INDIVIDUAL DEFENDANTS

## PURSUANT TO 42 U.S.C. §1983

Plaintiffs' Complaint asserts four constitutional claims against Defendants: (1)

violations of substantive due process, (2) violations of procedural due process, (3) violations

of equal protection requirements, and (4) a violation of the Dormant Commerce Clause of

the Constitution.  These constitutional claims are actionable against the individually named

Defendants pursuant to 42 U.S.C. § 1983.  However, Defendants have challenged each of

Plaintiffs' constitutional claims as being insufficiently pleaded in order to survive a challenge

under Rule 12(b)(6).  The individually named Defendants also assert that they are entitled to

qualified immunity.

Section 1983 is an enabling statute that provides a remedy for the violation of federal

constitutional or statutory rights.  Section 1983 states:

> Every person who, under color of any statute, ordinance, regulation, custom,
> or usage, of any State or Territory or the District of Columbia, subjects, or
> causes to be subjected, any citizen of the United States or other person within
> the jurisdiction thereof to the deprivation of any rights, privileges or immunities
> secured by the Constitution and laws, shall be liable to the party injured in an
> action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.

Thus, to state a claim under Section 1983, a plaintiff must demonstrate that the

defendant, acting under color of state law, deprived the plaintiff of a right secured by the

Constitution or the laws of the United States.  *See Parratt v. Taylor*, 451 U.S. 527, 535

(1986); *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008) (quoting *Kaucher v. County of*

*Bucks*, 455 F.3d 418, 423 (3d Cir. 2006)). Furthermore, to face liability under Section 1983, a defendant must have "exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 23 (3d Cir. 1997) (internal citations and quotations omitted).

Section 1983 "is not itself a source of substantive rights, but a method for vindicating federal rights elsewhere conferred...." *Phillips v. Northwest Reg'l Commc'ns*, 391 F. App'x 160, 165 (3d Cir. 2010) (quoting *Baker v. McCollan*, 443 U.S. 137, 145 n.3 (1979)). Under Section 1983, Plaintiffs can allege violations of federal and constitutional law, but Section 1983 cannot provide a cause of action not founded on substantive federal or constitutional law. Accordingly, the Court must now inquire as to whether Plaintiffs have sufficiently alleged that Defendants deprived them of any of the constitutional rights asserted in Plaintiffs' Complaint.

At the outset, Defendants assert that Hanger, Callaghan, Menghini, Brady, Houtz and Kutney, in their individual capacities, are entitled to qualified immunity.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S.Ct. 808, 172 L.Ed.2d 565 (2009)(quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). Qualified immunity

serves the dual purpose of holding government officials accountable when their power is

exercised unreasonably and protecting those officials from "harassment, distraction, and

liability when they perform their duties reasonably." *See id.* "Qualified immunity applies

regardless of whether the government official's error is 'a mistake of law, a mistake of fact,

or a mistake based on mixed questions of law and fact.'" *Id.* (citing *Groh v. Ramirez*, 540

U.S. 551, 567, 124 S.Ct. 1284, 157 L.Ed.2d 1068 (2004) (Kennedy, J., dissenting)).

Qualified immunity is "an immunity from suit rather than a mere defense to liability . .

. it is effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472

U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985)(emphasis deleted).  The qualified

immunity doctrine serves to eliminate "insubstantial claims" prior to discovery. *Pearson*, 555

U.S. at 231 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 n. 2, 107 S.Ct. 3034, 97

L.Ed.2d 523 (1987)).  The Supreme Court has "stressed the importance of resolving

immunity questions at the earliest possible stages in litigation." *Hunter v. Bryant*, 502 U.S.

224, 227, 112 S.Ct. 534, 116 L.Ed.2d 589 (1991) (per curiam).

In *Saucier v. Katz*, 533 U.S. 194, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001), the

Supreme Court articulated a two-step test to determine the appropriate application of

qualified immunity.  A court must decide: (1) whether the facts alleged by the plaintiff violate

a constitutional right; and (2) if so, whether that right was "clearly established" at the time of

the alleged violation. *Id.* at 201.  Qualified immunity attaches unless the official's conduct

violated such a clearly established right. *Anderson*, 483 U.S. at 640.  However, the *Saucier*

procedure, which erected a rigid framework, no longer mandates that district courts decide

the two prongs in any particular order. *Pearson*, 555 U.S. at 236. The decision is left to the

discretion of the district court. *Id.*

The Third Circuit has held that a right is "clearly established" when the "contours of

the right are 'sufficiently clear that a reasonable official would understand that what he is

doing violates that right.'" *McGreevy v. Stroup*, 413 F.3d 359, 366 (3d Cir. 2005) (quoting

*Saucier*, 533 U.S. at 202). For a right to be "clearly established," it does not require that

"the very action in question has previously been held unlawful," *Id.* (quoting *Hope v. Pelzer*,

536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)); rather it means that in the

context of preexisting law, "the unlawfulness of the official's conduct was reasonably and

objectively apparent." *McGreevey*, 413 F.3d at 366 (citing *Wilson v. Layne*, 526 U.S. 603,

615, 119 S.Ct. 1692, 143 L.Ed.2d 818 (1999)). The "salient question" is "whether the state

of law [at the time of the incident] gave respondents fair warning" that their actions were

contrary to the law. *See Hope*, 536 U.S. at 741. For the reasons discussed below in which

the Court addresses the substantive issues raised by Plaintiffs, it is apparent that such fair

warning is absent in the present case and that Defendants did not violate any clearly

established right. In fact, the Court finds that Plaintiffs' Complaint fails to assert any

violation of an established constitutional or statutory right even when granting Plaintiffs

every inference in their favor pursuant to Rule 12(b)(6). Accordingly, the individual

13

Defendants shall be entitled to qualified immunity for their actions as presented in Plaintiffs'
Complaint.

## A. Dismissal of Defendant PADEP Secretary John Hanger

Defendants argue that former DEP Secretary John Hanger must be dismissed as a
defendant in this suit because Plaintiffs' Complaint bases its Section 1983 claim against Mr.
Hanger on the basis of *respondeat superior* liability.  (Defs.' Memo. of Law in Support of
Mot. To Dismiss at 4.)  Plaintiffs argue that the Mining Clean Fill standard was used for over
fifteen years and therefore the Complaint raises a reasonable inference that former
Secretary Hanger knew and acquiesced to the alleged conduct and can be held personally
liable. (Pls.' Memo. Of Law in Opp. To Defs.' Mot. To Dismiss at 3.)

In order for a plaintiff to state a claim against a defendant under Section 1983, the
individual government defendant must have personal involvement in the alleged
wrongdoing.  Liability cannot be predicated solely on the operation of respondeat superior.
*See Rode v. Dellarciprete*, 845 F.2d 1195, 1207 (3d Cir. 1988).  A plaintiff may show
personal involvement "through allegations of personal direction or of actual knowledge and
acquiescence." *Rode*, 845 F.2d at 1207.

Plaintiffs' Complaint does not allege any specific instances where Mr. Hanger had
personally directed any of the other defendants, or that he had any actual knowledge and
acquiesced to any specific action.  His name is only mentioned three times in the Complaint:
in the caption, in paragraph 5 where he is identified as DEP Secretary, and in paragraph

203 where he is alleged to be a state actor. (Defs.' Rep. Brief in Support of Mot. To Dismiss at 6.) As such, Mr. Hanger must be dismissed as a defendant, since there are insufficient allegations of personal action, conduct, or wrongdoing against him or actual knowledge or acquiescence in the matters complained of.

## B. Due Process

The Court turns its attention to issues of constitutional due process violations. In Counts I and IV respectively, Plaintiffs assert that Defendants violated both the substantive and procedural components of the Fourteenth Amendment's Due Process Clause when they arbitrarily, capriciously, and/or improperly denied its Source Approval Request and by its failure to adhere to constitutionally adequate procedural requirements. (Pls.' Compl. at ¶¶ 164 and 201.)

### 1. *Substantive Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." *Nicholas v. Pennsylvania State Univ.*, 227 F.3d 133, 138 (3d Cir. 2000). While this constitutional provision was initially intended to address the suitability of state procedures, the Supreme Court has held that this clause also has a substantive component. *See, e.g., Planned Parenthood v. Casey*, 505 U.S. 833, 877 (1992) (holding that portions of the Pennsylvania Abortion Control Act violated substantive due process of plaintiffs by placing an "undue burden" on a woman's right to choose to terminate her pregnancy).

The Third Circuit has held that the "fabric of substantive due process, as woven by our courts, encompasses at least two very different threads." *Nicholas*, 227 F.3d at 139. The first "thread" of substantive due process applies to legislative acts. *Koorn v. Lacey Twp.*, 78 F. App'x 199, 202 (3d Cir. 2003). A legislative act is, "generally[,] laws and broad executive regulations" which "apply to large segments of society" -- as distinguished from a non-legislative, or executive act, which "typically applies to one person or to a limited number of persons." *Nicholas*, 227 F.3d at 139 n. 1. A legislative act that limits a fundamental right will survive a substantive due process challenge only if it is necessary to promote a compelling governmental interest. *Id.* at 139. When a fundamental right is not at stake, a law must be rationally related to a legitimate government interest in order to survive a substantive due process challenge. *Koorn*, 28 F. App'x at 202.

The second "thread" of substantive due process jurisprudence analyzes "non-legislative," or executive, government actions. *Id.* In order to state a claim for a non-legislative violation of substantive due process, a plaintiff must allege: (1) that he was deprived of a fundamental right, and (2) that the government conduct at issue was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *See Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 425 (3d Cir.2006) (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998)). The Third Circuit has stated that if the property interest being deprived is determined to be "fundamental" under the Constitution, then substantive due process protects the plaintiff from arbitrary or irrational deprivation,

regardless of the adequacy of procedures used. *See Nicholas*, 227 F.3d at 142. However,

if the interest is not "fundamental," no substantive due process protection exists so long as

the state satisfies the requirements of procedural due process. *Id.*

> To summarize: when a plaintiff challenges the validity of a legislative act, substantive due process typically demands that the act be rationally related to some legitimate government purpose. In contrast, when a plaintiff challenges a non-legislative state action (such as an adverse employment decision), we must look, as a threshold matter, to whether the property interest being deprived is "fundamental" under the Constitution. If it is, then substantive due process protects the plaintiff from arbitrary or irrational deprivation, regardless of the adequacy of procedures used. If the interest is not "fundamental," however, the governmental action is entirely outside the ambit of substantive process and will be upheld so long as the state satisfies the requirements of procedural due process.

*Nicholas*, 227 F.3d at 142.

The Third Circuit has provided three standards which can support a finding that

government action shocks the conscience: "(1) deliberate indifference; (2) gross negligence

or arbitrariness that indeed shocks the conscience; or (3) intent to cause harm." *See*

*Phillips v. County of Allegheny*, 515 F.3d 224, 241 (3d Cir. 2008) (citing *Sanford v. Stiles*,

456 F.3d 298, 306 (3d Cir. 2006)). The Third Circuit has also held that "where the state

actor had ample time for deliberation before engaging in the allegedly unconstitutional

conduct, the appropriate standard will be deliberate indifference." *Sanford*, 456 F.3d at 309-

10. However, the Supreme Court has said that "shocking the conscience" is not a rigid

formula, holding that "[d]eliberate indifference that shocks in one environment may not be

so patently egregious in another, and our concern with preserving the constitutional

17

proportions of substantive due process demands an exact analysis of circumstances before

any abuse of power is condemned as conscience shocking." *Lewis*, 523 U.S. at 850.

Furthermore, the Third Circuit has held that "land-use decisions are matters of local

concern and such disputes should not be transformed into substantive due process claims

based only on allegations that government officials acted with 'improper' motives." *United*

*Artists Theatre Circuit, Inc. v. Twp. of Warrington*, 316 F.3d 392, 402 (3d Cir. 2003). There,

departing from the improper motives test for the "shocks the conscience" standard, the Third

Circuit imposed a demanding requirement if the "shocks the conscience" standard in land-

use decisions is to be met. *See United Artists*, 316 F.3d at 400. Specifically, in order to

prevent the Court from "being cast in the role of a 'zoning board of appeals,'" a state actor's

conduct must encompass only the most egregious official conduct. *Id.* at 400 (quoting

*County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998) ("[t]he 'shocks the conscience'

standard encompasses 'only the most egregious official conduct'").

With regard to enforcement of DEP regulations, the Third Circuit has imposed a

heightened "shocks the conscience" standard wherein the defendant's actions must "rise to

a level of self-dealing, corruption, bias against an ethnic group, or any additional activity that

may suggest conscience-shocking behavior." *Angino v. Wagner*, 2009 U.S. Dist. LEXIS

79216 at *47; 2009 WL 2859041 (M.D. Pa. Sept. 3, 2009) (*citing Dotzel v. Ashbridge*, 306 F.

App'x 798, 801 (3d Cir. 2009); *see also Chainey v. Street*, 523 F.3d 200, 219-220 (3d Cir.

2008)("merely alleging an improper motive is insufficient, even where the motive is unrelated to the merits of the underlying decision")).

The Third Circuit has observed that substantive due process "is an area of law famous for its controversy, and not known for its simplicity." *DeBlasio v. Zoning Bd. of Adjustment*, 53 F.3d 592, 598 (3d Cir. 1995) (internal quotation omitted). However, it is clear that the first step in evaluating a due process claim is to identify the exact contours of the underlying right a plaintiff claims was violated. *Chainey v. Street*, 523 F.3d 200, 219 (3d Cir. 2008); *see Reno v. Flores*, 507 U.S. 292, 302 (1993) (finding that analysis "must begin with a careful description of the asserted right"); *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006). In this case, Pioneer has asserted that it is entitled to substantive due process protection in regard to property interests from both legislative and executive action.

### a.) *Do Plaintiffs have a "Fundamental Right"?*

Initially, a review of the Complaint shows that Plaintiffs failed to allege that actions in this case were legislative actions; indeed, their allegations are to the contrary. For instance, Plaintiffs aver that the Mining Clean Fill standard "has never been promulgated and approved as a regulation pursuant to formal rulemaking procedures." (*See* Pls' Compl. at ¶ 45.) Plaintiffs further allege that the Mining Clean Fill standard "has never been submitted to the Legislative Reference Bureau for filing and publication," and that it was not "promulgated pursuant to Pennsylvania's formal rulemaking or policymaking procedures." (*See* Pls' Compl. at ¶¶ 46-47.) In fact, Plaintiffs repeatedly refer to the Mining Clean Fill

standard as a "draft." (See, e.g., Pls' Compl. at ¶ 51.)  Accordingly, the allegations in Plaintiffs' Complaint admit that the Mining Clean Fill standard is a non-legislative, executive action.

This Court will begin analysis of Plaintiffs' substantive due process claim by determining the contours of their "fundamental right."   Plaintiffs assert that numerous protected constitutional rights have been violated by Defendants, including the right to the use, control, and enjoyment of their real property and business, the right to contract, the right to operate a business and engage in livelihood of one's choice free from interference, and the right to obtain a permit required to perform operations that are central to the continued viability of a particular business. (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss 10.)   We will examine each right in turn.

Plaintiffs' first contention, based on their asserted "right" to operate a business and engage in the livelihood of one's choice, is misplaced.  While "the liberty to pursue a calling or occupation ... is secured by the Fourteenth Amendment," the Third Circuit held that same liberty interest at issue is "not the right to a specific job." See Piecknick v. Commonwealth of Pennsylvania, 36 F.3d 1250, 1259 (3d Cir. 1994)("[s]tate actions that exclude a person from one particular job are not actionable in suits"). In Piecknick, the owner of a towing company sued the Commonwealth of Pennsylvania under Section 1983 on the grounds that he and his company were deprived of due process under the Fourteenth Amendment when a rival business was permitted to operate within a towing zone established by the state

police that was formerly serviced by Piecknick alone for several previous years. Piecknick argued that this operating zone constituted a protectable property interest, and that a competing towing company that serviced a neighboring zone could not be assigned to receive calls for that area. The Third Circuit held that the state police's addition of another towing operator to the roster responsible for responding to emergency calls in Piecknick's zone was "not an unreasonable interference with Piecknick's right to pursue its chosen occupation." *Id.* at 1261. In doing so, the Third Circuit applied the reasoning that "[s]tate actions that exclude a person from one particular job are not actionable" under the Due Process clause to support a similar conclusion in a non-employment context.

While the Fourteenth Amendment's Due Process Clause does include a "generalized due process right to choose one's field of private employment," the right is nevertheless subject to a degree of government regulation. *See Conn v. Gabbert*, 526 U.S. 286, 291-92, 119 S.Ct. 1292, 143 L.Ed.2d 399 (1999)(execution of search warrant did not unconstitutionally interfere with an attorney's "right to practice his profession"). Under this legal standard, to survive a motion to dismiss, Plaintiffs must allege with sufficiency that Defendants have prohibited Plaintiffs from all work in operating their mining business[2] or that the challenged regulations are not rationally related to a legitimate state interest. *See, e.g., Latessa v. New Jersey Racing Comm'n*, 113 F.3d 1313, 1318 (3d Cir. 1997) (affirming grant of summary judgment where Plaintiff "failed to present any support for his contention

---

[2] Plaintiffs' Complaint alleges that Pioneer is engaged in mining operations, and that they also engage in ancillary activities related to mining, including the reclamation of land. (*See* Pls.' Compl. at ¶¶ 12-13.)

that due to his non-reappointment he was effectively banned from all work in his occupation as a racing judge").

Here, Plaintiffs do not allege that they have been prohibited from operating their mining business, nor have they adequately pleaded a deprivation of a fundamental right with regard to their ability to operate their mining business. Instead, Plaintiffs argue that they have been prohibited from operating the reclamation aspect of their business because of all the money they have lost investing in the WABP clean fill project. However, Plaintiffs misconstrue this right. Defendants have not prohibited Plaintiffs from starting another reclamation project, nor are Plaintiffs "effectively banned" from ever starting another reclamation business. In fact, Plaintiffs still hold a Surface Mining Permit with the option to reclaim the land at issue in this case. As such, they have failed to allege that they have a constitutionally protected "fundamental" right to operate their business and pursue their chosen occupation which Defendants have violated.

Plaintiffs also claim that they have the right to the use, control, and enjoyment of their real property and business. The crux of Plaintiffs argument is that Defendants' Mining Clean Fill standard, which applies to their SMP, unconstitutionally infringes upon their right to use their land and operate their business in an unencumbered manner. To be clear, the Third Circuit has stated that "ownership is a property interest worthy of substantive due process protection." *DeBlasio*, 53 F.3d at 600; *see Nicholas*, 227 F.3d at 141 ("[W]e have so far limited non-legislative substantive due process review to cases involving real property

ownership."); *Wrench Transp. Sys., Inc. v. Bradley*, 340 F. App'x 812, 815 (3d Cir. 2009) (finding that real property interests can be protected by substantive due process). This circuit has also suggested that certain permits may implicate a fundamental right. *See M&M Stone Co.*, 2008 WL 4467176, at *21 (E.D. Pa. Sept. 29, 2008) (recognizing that zoning decisions, building permits, or other governmental permission required for some intended use of land owned by the plaintiffs implicate the fundamental property interest in the ownership of land); *see also Indep. Enters., Inc. v. Pittsburgh Water and Sewer Auth.*, 103 F.3d 1165, 1179 1179 n. 12 (3d Cir. 1997)(recognizing that fundamental interests arise in matters involving "zoning decisions, building permits, or [instances where] other governmental permission required for some intended use of land" is required)).

However, while Plaintiffs are correct in that they have a constitutionally protected "fundamental" right to use and operate their land and business, they do not have a protected right to conduct some particular business operation or to obtain a specific land-use permit. *See Piecknick,* 36 F.3d at 1261-62 (there is a Fourteenth Amendment liberty to pursue a calling or occupation, but not the right to engage in a specific business operation, i.e., an exclusive towing contract in a particular area); *Holt Cargo Sys., Inc. v. Delaware River Port Auth.*, 20 F. Supp. 2d 803, 830 (E.D. Pa 1998) (acknowledging that property ownership, and even a lease, are property interests worthy of substantive due process protection, but limited the scope, holding that claims of lost customers, lost profits, loss of a bid, and breach of a lease are not enough to establish a constitutional due process claim);

*Phantom of E.Pennsylvania v. New Jersey State Police*, Civ. A. No. 07-2748, 2008 U.S.

Dist. LEXIS 38624 at \*7 (E.D. Pa. May 13, 2008) (Plaintiff must allege more to show a

constitutional injury than that it has lost unspecified business where it still has the ability to

carry out its fundamental business operation). As the Third Circuit noted with regard to

contractual rights being afforded the status of protected property:

> [T]wo general types of contract rights are recognized as property protected
> under the Fourteenth Amendment: (1) where "the contract confers a protected
> status, such as those characterized by a quality of either extreme
> dependence in the case of welfare benefits, or permanence in the case of
> tenure, or sometimes both, as frequently occurs in the case of social security
> benefits"; or (2) where "the contract itself includes a provision that the state
> entity can terminate the contract only for cause."

*Linan–Faye Construction Co. v. Housing Auth. of the City of Camden,* 49 F.3d 915, 932 (3d

Cir.1995) (quoting *Unger v. Nat'l Residents Matching Program,* 928 F.2d 1392, 1399 (3d

Cir.1991)). Here, Plaintiffs cannot point to any protected right by which they are entitled to

use the WABP fill at their reclamation site.

The question presented to this Court is whether Defendants' use of the Mining Clean

Fill standard to deny Plaintiffs' application for a permit to receive fill from the WABP, instead

of granting Plaintiffs' a permit based on Defendants' Bureau of Waste's fill requirements,

unconstitutionally infringes on Plaintiffs' right to continue to use and enjoy their private

property and continue to operate their business. In other words, does the Defendants' use

of the Mining Clean Fill standard impermissibly deprive Plaintiffs of a fundamental right

protected as a matter of constitutional substantive due process? We hold that it does not.

Unlike any of the cases that the Plaintiffs cite, no specific fundamental property interest has actually been deprived. For example, in *M&M Stone*, the plaintiff's permit to operate a stone quarry was revoked, rendering the company unable to continue to use their property. *See generally M&M Stone*, No. 07-4784, 2008 U.S. Dist. LEXIS 76050 (E.D. Pa. Sept. 29, 2008). In the case *sub judice*, Plaintiffs' surface mining permit has not been revoked. In fact, they still hold their initial SMP with the option to reclaim the land. Further, Plaintiffs allege only one instance in which clean fill was denied, and they remain free to apply for any new clean fill options to reclaim the land. Plaintiffs' Complaint does not indicate that Defendants have erected any absolute barrier to Plaintiffs mining or land reclamation operations. Most significantly, long before the issues underlying this case arose, Plaintiffs agreed as a condition of receiving a revised non-coal surface mining permit, to abide by the Mining Clean Fill standards in any reclamation of their land. Accordingly, Plaintiffs were not denied a constitutionally protected right with regard to their real property and business interests, and explicitly consented to abide by the Mining Clean Fill standards as a condition of receiving a revised non-coal surface mining permit.

### b.) Do the Actions of Defendants "Shock the Conscience?"

Even if this Court were to determine that Plaintiffs have a constitutionally protected fundamental right, Defendants actions in denying Plaintiffs source approval request do not "shock the conscience" under prevailing Third Circuit standards. Plaintiffs argue that Defendants lacked the legal authority to regulate surface mining operations, particularly

reclamation. (Pls.' Compl. at ¶ 166.) Further, Plaintiffs argue that this Court should apply

the deliberate indifference standard set out in *Sanford v. Stiles*. *See Sanford v. Stiles*, 456

F.3d 298, 306 (3d Cir. 2006).

In *Sanford*, the Third Circuit affirmed a district ruling granting summary judgment

against a mother of a student who committed suicide. *Id*. at 301.   The decedent's mother

filed a Section 1983 claim against the student's school district and a guidance counselor for

infringing upon the student's substantive due process rights under a state-created danger

theory. *See Sanford*, 456 F.3d at 301.   Defendants argue that the "deliberate indifference"

standard should not be applied in the present matter, because Sanford was a "state-created

danger" case, and thus sets out the wrong standard to be applied herein. (Defs.' Reply

Brief at 14.)

Plaintiffs are correct in that *Sanford* observes that "the level of culpability required to

shock the conscience increases as the time state actors have to deliberate decreases";

nevertheless, that holding only applies to state-created danger cases. *See Sanford*, 456

F.3d at 309.   The present matter, however, should be analyzed in accord with the land-use

cases cited above.   Therefore, the appropriate standard is whether Defendants' actions rose

"to a level of self-dealing, corruption, bias against an ethnic group, or any additional activity

that may suggest conscience-shocking behavior." *Angino*, 2009 U.S. Dist. LEXIS 79216 at

\*47 (*citing Dotzel*, 306 F. App'x at 801); *see also Eichenlaub v. Twp. of Indiana*, 385 F.3d

274, 285 (3d Cir. 2004)(in zoning context, behavior that "shocks the conscience" involves

"only the most egregious official conduct"). Defendants maintain that their actions were

necessary to protect the environment as well as the public. *See County of Sacramento v.*

*Lewis*, 523 U.S. 833, 849 (1998)("conduct deliberately intended to injure in some way

unjustifiable by any government interest is the sort of official action most likely to rise to the

conscience-shocking level"); *see also Highway Materials, Inc. v. Whitemarsh Twp.*, 386 F.

App'x 251, 258 (3d Cir. 2010) (quoting *Harlen Assocs. V. Inc. Vill. Of Mineola*, 273 F.3d

494, 505 (2d Cir. 2001)(finding that so long as the state actors did not act in a way that

"transgresses the 'outer limit' of legitimate governmental action... [it will] not give rise to a

federal substantive due process claim"); *Vorum v. Canton Twp.*, 308 F. App'x 651, 653 (3d

Cir. 2009)("[A] state actor's decision is not conscience-shocking if it is related to a legitimate

governmental objective")).

Plaintiffs in this case were denied their Source Approval Request by PADEP's

Bureau of Mining. So long as Defendants acted in a way that did not "transgress[] the 'outer

limit' of legitimate governmental action," *see Highway Materials, Inc.*, 386 F. App'x at 258,

and to the degree that their actions were related to a legitimate governmental objective, *see*

*id.*, Defendants' actions do not give rise to the requisite level of egregiousness essential to a

finding that their actions shock the conscience. The state has a valid interest in ensuring

that contaminated fill, or fill which cannot be verified to be uncontaminated, is not placed in

a mine void in a way that would threaten the purity of the water table.

## 2. *Procedural Due Process*

Count IV of Plaintiffs' Complaint also contends that Defendants violated Plaintiffs' right to procedural due process. In order to state a claim for a violation of procedural due process, Plaintiffs must allege that: (1) they were deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of life, liberty, or property; and (2) the procedures available did not provide due process of law. *See Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000); *Hill v. Borough of Kutztown*, 455 F.3d 225, 233-34 (3d Cir. 2006).

### a.) *Property Interest*

First, the Court must determine whether Plaintiffs have alleged any "deprivation of a constitutional right at all." *See MFS Inc. v. DiLazaro*, 771 F. Supp. 2d 382, 434 (E.D.Pa 2011) (*quoting Culinary Service of Delaware Valley, Inc., v. Borough of Yardley*, 385 F. App'x 135, 141 (3d Cir. 2010). Plaintiffs allege multiple violations of protected property interests including the right to use, control, and enjoy their real property and business; their permit to conduct noncoal mining activities; their right to pursue its mining and reclamation activities free from unreasonable or arbitrary government constraint; and their right of contract. (Pls.' Compl. at ¶¶ 196-199.)

To have a cognizable property interest under the Fourteenth Amendment it is required that a party show "more than an abstract need or desire" for the property; it requires more than a "unilateral expectation" of entitlement to the property. *See Bd. of*

*Regents of State Colleges v. Roth*, 408 U.S. 564, 577, 92 S.Ct. 2701, 33 L.Ed.2d 548

(1972). Rather, a person must have a "legitimate claim of entitlement" to the property. *See*

*Roth,* 408 U.S. at 577. These protected property interests are created in various ways,

such as "existing rules or understandings that stem from an independent source such as

state law," and the "types of interests protected as property are varied and, as often as not,

are intangible." *Stana v. Sch. Dist. of the City of Pittsburgh*, 775 F.2d 122, 125 (3d Cir.

1985). While property interests are usually "expressly created by state statutes or

regulations," they can "also arise from written or unwritten state or local government

policies...." *Id.* at 126. (citing *Perry v. Sindermann*, 408 U.S. 593, 601-602 (1972)).

The Third Circuit has held fundamental property interests, for procedural due

process purposes, can be implicated by zoning decisions, building permits, or other issues

requiring governmental permission for some intended use of plaintiff's land. *See*

*Independent*, 103 F.3d at 1179 n12; *see also MFS*, 771 F. Supp. at 434 n. 50 (holding that

zoning decisions, building permits, and other issues that require some governmental

permission may implicate a fundamental property interest). The Third Circuit has also held

that a business itself is an established property right entitled to protection by the Fourteenth

Amendment. *See College Savings Bank v. Florida Prepaid Post-Secondary Education*

*Expense Board*, 131 F.3d 353, 361 (3d Cir. 1997); *see also MFS*, 771 F. Supp. at 434-435.

Plaintiffs have a surface mining permit that was issued by the PADEP pursuant to

the Noncoal Surface Mining Conservation and Reclamation Act, 52 P.S. § 3301, and

authorized by the Surface Mining Conservation and Reclamation Act, 52 P.S. § 1391.1.

The permit allows Plaintiffs to operate a noncoal mine with the option for reclamation of the

land so long as said reclamation is in accord with PADEP's Bureau of Mining standards.

Further, as Plaintiffs admit in their Complaint, the issuance of the surface mining permit was

specifically conditioned upon Plaintiffs' acceptance of the prevailing standards set forth by

the Bureau of Mining. Accordingly, Plaintiffs have stated the existence of a legitimate

property interest.

b.) *Appropriate Procedures Available*

Recognizing that Plaintiffs have a property interest in their business and in the land

involved in their operation, as a matter of state law, the procedures afforded to Plaintiffs

provided them with adequate procedural due process. Procedural due process is satisfied

when a state affords a full judicial mechanism with which to challenge the administrative

decision at issue. *See Bello v. Walker*, 840 F.2d 1124, 1128 (3d Cir. 1998), *abrogated on*

*other grounds by, United Artists Theatre Circuit, Inc. v. Township of Warrington, PA*, 316

F.3d 392, 394 (3d Cir. 2003). If adequate process is provided by state procedures,

procedural due process is satisfied whether or not a plaintiff avails itself of the provided

appeal mechanism. *See DeBlasio v. Zoning Bd. of Adjustment for the Twp. of West*

*Amwell*, 53 F.3d 592, 597 (3d Cir. 1995), *abrogated on other grounds by United Artists*

*Theatre Circuit, Inc.*, 316 F.3d at 400-401 (internal citations and quotations omitted). "The

availability of a full judicial mechanism to challenge the administrative decision to deny an

application, even an application that was wrongly denied, preclude[s] a determination that the decision was made pursuant to a constitutionally defective procedure." *Midnight Sessions, Ltd. v. City of Philadelphia*, 945 F.2d 667, 681 (3d Cir. 1991), *abrogated on other grounds by United Artists*, 316 F.3d at 400-401. Moreover, the available state procedure need not provide all the relief available under a section 1983 cause of action in order for the available state procedure to be constitutionally adequate. *Parratt v. Taylor*, 451 U.S. 527, 543-544 (1981), *overruled on other grounds*, by *Daniels v. Williams*, 474 U.S. 327 (1986).

Under Pennsylvania law, Plaintiff has the right to challenge before the Commonwealth of Pennsylvania Environmental Hearing Board ("EHB") any adverse decision taken by PADEP against a permit. *See* 35 P.S. § 7514; *see also Commonwealth of Pennsylvania, Department of Environmental Protection v. Schneiderwind*, 867 A.2d 724, 727 (Pa. Commw. Ct. 2005). Furthermore, under 42 Pa.C.S.A. § 763, Plaintiffs have the right to appeal any adverse decision of the Environmental Hearing Board to the Commonwealth Court of Pennsylvania. *See Pennsylvania Coal Mining Association v. Watt*, 562 F.Supp. 741, 744 (M.D. Pa. 1983). Here, Plaintiffs not only had the right to challenge PADEP's actions before the Environmental Hearing Board, they did so. Plaintiffs appealed to the EHB and were given an opportunity to conduct discovery. It was Plaintiffs' decision to cease the appeal procedure once the clean fill they had sought from the WABP was sent to another site. Plaintiffs had the "availability of a full judicial mechanism" to challenge the adverse administrative decision. *See Midnight Sessions, Ltd.*, 945 F.2d at 681. ("The

availability of a full judicial mechanism to challenge the administrative decision to deny an application, even an application that was wrongly denied, precluded a determination that the decision was made pursuant to a constitutionally defective procedure").

The Environmental Hearing Board is a neutral arbiter, and Plaintiffs were represented by counsel before the Board. Plaintiffs filed various motions and exhibits, and the Environmental Hearing Board heard testimony from members of the Bureau of Mining. It is apparent that the state provided a neutral, judicial mechanism by which appeals could be taken, and that Plaintiffs were not denied procedural due process.

For the reasons stated above, this Court grants Defendants' motion to dismiss Counts I and IV of Plaintiffs' Complaint.

## C. Dormant Commerce Clause

Count II of Plaintiffs' Complaint asserts a Dormant Commerce Clause violation. (*See generally* Pls.' Compl. at ¶¶ 169-179.) Plaintiffs allege that Defendants' policy, practice, custom, or procedure of refusing to approve out-of-state fill for mine reclamation constitutes an unlawful, discriminatory, and illegal restraint on interstate commerce. Specifically, Plaintiffs' argue that Defendants' policy advances no legitimate state purpose and even if one existed, there are other nondiscriminatory means available to promote any such purpose without burdening or restraining interstate commerce. (Pls.' Compl. at ¶¶ 172-179.) On the other hand, Defendants argue that Plaintiffs have not identified any law that facially discriminates against interstate commerce nor have they alleged that any out-of-state

competitor that wants to do business in Pennsylvania is burdened by its policies. (Defs.' Brief in Support of Mot. To Dismiss at 15.)

The Commerce Clause gives Congress the power "to regulate Commerce... among the several States." U.S. CONST. art. I, § 8 cl. 3. Although the Commerce Clause speaks specifically to powers granted to Congress, the Court has recognized that it can also limit the power of the States "to erect barriers against interstate trade." *Lewis v. B.T. Inv. Managers, Inc.*, 447 U.S. 27, 35 (1980). Specifically, the Commerce Clause has an implied requirement—the Dormant Commerce Clause—that the states not "mandate differential treatment of in-state and out-of state economic interests that benefits the former and burdens the latter." *Keystone Redevelopment Partners, LLC v. Decker*, 631 F.3d 89, 106 (3d Cir. 2011) (Fisher, J., concurring and dissenting) (quoting *Granholm v. Heald*, 544 U.S. 460, 472 (2005)). The modern law of the Dormant Commerce Clause "is driven by concern about 'economic protectionism'—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *Dep't of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337-38, 128 S.Ct. 1801, 170 L.Ed.2d 685 (2008) (internal citations omitted). Individuals that have been injured by some state action violating the Dormant Commerce Clause may sue and obtain injunctive and declaratory relief under Section 1983. *Dennis v. Higgins*, 498 U.S. 439, 447, 111 S.Ct 865, 112 L.Ed.2d 969 (1991).

Dormant Commerce Clause analysis involves a two-step inquiry: the first question is "whether a challenged law discriminates against interstate commerce." *Davis*, 553 U.S. at

338; *see also United Haulers Ass'n., Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338, 127 S.Ct. 1786, 167 L.Ed.2d 655 (2007) ("to determine whether a law violates this so-called 'dormant' aspect of the Commerce Clause, we first ask whether it discriminates on its face against interstate commerce"). Discrimination is the "differential treatment of in-state and out-of-state economic interests that benefit the former and burdens the latter." *Oregon Waste Sys. Inc. v. Dep't of Envtl. Quality of Oregon*, 511 U.S. 93, 99, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994). "Discriminatory laws motivated by simple economic protectionism are subject to a virtually *per se* rule of invalidity which can only be overcome by a showing that the state has no other means to advance a legitimate local purpose." *United Haulers Ass'n*, 550 U.S. at 338-39. "When a state statute clearly discriminates against interstate commerce, it will be struck down unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism . . . ." *Wyoming v. Oklahoma*, 502 U.S. 437, 455, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992)(internal citations omitted). The second step of the inquiry examines any potential burden placed on interstate commerce: "Absent discrimination for [a] forbidden purpose [ . . .] the law 'will be upheld unless the burden imposed on [interstate] commerce is clearly excessive in relation to the putative local benefits.'" *Davis*, 553 U.S. at 338-39.

Defendants argue that Plaintiffs fail to identify any law, statute, regulation, or local ordinance that allegedly discriminates on its face against interstate commerce. (Defs.' Mem. of Law in Support of Mot. To Dismiss at 15.) Defendants argue that the Mining Clean

Fill standard is a statement of policy, not a *de facto* regulation as Plaintiffs argue, and as such cannot discriminate against interstate commerce. (*Id*.) Defendants' analysis misstates the legal framework, because a law can discriminate against out-of-state interests either facially, or in practical effect. *See Wyoming,* 502 U.S. at 454-55. Accordingly, whether or not the Mining Clean Fill standard is a statement of policy is not a determination that is useful to the disposition of this case. Plaintiffs cite a litany of case law that persuasively shows how executive actions may infringe on the Commerce Clause. *See, e.g., Atl. Coast Demol. & Recyc., Inc. v. Bd. of Chosen Freeholders*, 112 F.3d 652 (3d Cir. 1997) (agency prohibited from implementing discriminatory formal or informal waste disposal policy); *Major Tours, Inc. v. Colorel,* 720 F. Supp. 2d 587, 609 (D.N.J. 2010) (discretionary actions of state officials); *Empire Sanitary Landfill, Inc. v. Com., Dep't of Envt'l Res*., 684 A.2d 1047, 1056, 1056-57 (Pa. 1996) (DEP's administrative policy for waste disposal burdened interstate commerce). A determination that executive action may violate the Dormant Commerce Clause, however, does not end the inquiry. In order to state a cause of action, Plaintiffs must also allege that there is a burden on out of state competitors, and that there is an excessive burden on interstate commerce in relation to any supposed benefit to be derived from the PADEP's rule.

Plaintiffs allege that "Defendants refused to approve any fill in 'good conscience,' including the subject Willis Avenue Bridge Project fill, that they could not personally inspect." (Pls.' Compl. at ¶ 174.) Plaintiffs further allege that "[f]or various reasons including

substantial staffing deficiencies and insufficient resources, Defendants refused to travel out-of-state to personally inspect the fill." (Pls.' Compl. at ¶ 175.) Plaintiffs then aver that "Defendants' policy, practice, custom, or procedure of refusing to approve out-of-state fill for mine reclamation constitutes an unlawful, discriminatory and illegal restrain on interstate commerce." (Pls.' Compl. at ¶ 175.) Plaintiffs do not, however, assert that they have been treated differently than any similarly situated market participant either within or outside Pennsylvania, nor do they allege that there is any absolute ban on the importation of out-of-state fill for the purposes of mine reclamation.

Plaintiffs' argument is premised upon the idea that Defendants illegally restricted the interstate sale of "clean fill"; thus, the object of the alleged Dormant Commerce Clause violation is the proposed clean fill and not the actual market participants who now seek relief. To begin, the Supreme Court's decision in *Oregon Waste Sys., Inc., supra*, specifically requires discrimination against "out-of-state economic interests" in order for a party to state a proper Dormant Commerce Clause discrimination claim. 511 U.S. at 99. It defies logic, as well as a commonsense reading of the Supreme Court's holding in that case, that inanimate fill, as opposed to an individual or a corporate entity, can possess an economic interest. Although "clean fill" possesses an intrinsic economic value, it is the buyers and sellers of such fill that maintain the economic interest protected by law. In the present matter, both Plaintiffs and the Coplay facility are in-state competitors, and it is the fill

which was from out-of-state. Essentially, Plaintiffs confuse the economic interest of the parties with the product underlying such an interest.

Further, Plaintiffs argument is belied by their allegation that the Coplay Facility was permitted to accept the "clean fill" under separate regulations applicable to inactive mines. Thus, Plaintiffs' Complaint admits that the contested "clean fill" in this matter was not barred from entering Pennsylvania for use as mine fill. This distinction is important because the denial of a permit to use the "clean fill" at Plaintiffs' facility was not a prohibition on the use of the WABP fill within the Commonwealth; rather, it was a regulation as to how a very specific product transacted in interstate commerce could be used once transported into the Commonwealth.

When courts consider whether nondiscriminatory state environmental statutes violated the Dormant Commerce Clause, they apply the test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970):

> [I]f a statute regulates "evenhandedly" and imposes only "incidental" burdens on interstate commerce, the courts must nevertheless strike it down if "the burden imposed on such commerce is clearly excessive in relation to the putative local benefits." Moreover, "the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Old Bridge Chemicals, Inc. v. New Jersey Dep't of Envt. Prt.*, 965 F.2d 1287, 1294-95 (3d Cir. 1992)(quoting *Pike*, 297 U.S. at 142).

"[W]here the burden on out-of-state interests rises no higher than that placed on

competing in-state interests, it is a burden on *commerce* rather than a burden on *interstate*

*commerce.*" *Old Bridge Chem., Inc.*, 965 F.2d at 1295. "A challenged regulation is

discriminatory when it confers advantages upon in-state economic interests, either directly

or through imposition of a burden upon out-of-state interests, as against out-of-state

competitors." *Id.* In the present matter, the PADEP's regulations do not facially discriminate

against out-of-state "competitors." Fill originating from an in-state location that did not meet

the same specifications would not have been deemed acceptable for use in Plaintiffs'

reclamation project. Therefore, it is of no legal consequence that the WABP fill originated

from an out-of-state location.

The courts have confronted similar matters.

In *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), the

Supreme Court addressed whether a Maine statute which "block[ed] all inward shipments of

live baitfish at the State's border," *id.* at 137, impermissibly violated the Dormant Commerce

Clause. The Court held that the state had a legitimate interest in regulating the inflow of

such a product because it may have a substantial impact on the state's environmental

concerns. The Court held:

> [W]e agree with the District Court that Maine has a legitimate interest in
> guarding against imperfectly understood environmental risks, despite the
> possibility that they may ultimately prove to be negligible. "The constitutional
> principles underlying the commerce clause cannot be read as requiring the
> State of Maine to sit idly by and wait until potentially irreversible
> environmental damage has occurred or until the scientific community agrees

on what disease organisms are or are not dangerous before it acts to avoid such consequences."

*Taylor*, 477 U.S. at 148 (quoting U.S. v. Taylor, 585 F. Supp. 393, 397 (D. Me.

1984). The Court further found that "there is little reason in this case to believe that

the legitimate justifications the State has put forward for its statute are merely a

sham or a '*post hoc* rationalization.'" *Id.* at 149 (citing *Hughes v. Oklahoma*, 441

U.S. 332, 338 n. 20, 99 S.Ct. 1727, 60 L.Ed.2d 250 (1979)).

In *City of Philadelphia v. New Jersey*, 437 U.S. 617, 98 S.Ct. 2531, 57

L.Ed.2d 475 (1978), the Supreme Court struck down a New Jersey law that

prohibited the importation of most out-of-state waste. The Supreme Court held that

the law was protectionist in nature, and that environmental concerns were merely a

pretext to shroud overarching economic concerns voiced by the New Jersey

legislature. *Id.* at 628. Specifically, the Supreme Court noted that the legislation was

primarily concerned with the availability of land-fill space, and that this concern

reflected economic interests as opposed to environmental ones. *See id.* at 627-28.

The Court also noted "that a State may not accord its own inhabitants a preferred

right of access over consumers in other States to natural resources located within its

borders." *Id.* at 627 (citing *West, Attorney General of Oklahoma v. Kansas Nat. Gas.*

*Co.*, 221 U.S. 229, 31 S.Ct. 564, 55 L.Ed.2d 716; *Pennsylvania v. West Virginia*, 262

U.S. 553, 43 S.Ct. 659, 67 L.Ed.2d 1117)).

In the present case, Defendants implemented a regulatory scheme governing the use of "clean fill" for mine reclamation projects. Such regulations were put into place to ensure that the environment is not adversely impacted by the use of such products whether they originate from within Pennsylvania or without. Unlike the facts underlying the Court's decision in *City of Philadelphia*, the economic value of land-fill space is not a relevant issue in this case; rather, it is the use of any material, notwithstanding its place of origin, that may contain certain toxic elements that animates the PADEP's strict "clean fill" requirements. Further, Plaintiffs in the present matter do not aver that in-state entities or fill are treated differently than out-of-state entities or fill with regard to the acceptable level of contamination, if any, that can be found within "clean fill." The WABP fill was not prohibited from entering Pennsylvania, and the WABP fill was permitted to be used in another facility in accordance with the PADEP's universal guidelines applicable to the specific facility where the "clean fill" was eventually deposited.

Similarly, the "clean fill" was not subject to an absolute ban akin to the baitfish in *Taylor*, *supra*, nor did Pennsylvania implement any regulation, tax, or surcharge meant to protect an in-state economic interest from out-of-state competitors. *See Chem. Waste Mgmt. v. Hunt*, 504 U.S. 334, 343-44, 112 S.Ct. 2009, 119 L.Ed.2d 121 (1992)(additional fee on out-of-state waste entering Alabama land-fills violated Commerce Clause because only basis for surcharge was the "origin of the waste"). The WABP fill itself was not subjected to any discrimination because of its origin; rather, the WABP fill was scrutinized

because of specific environmental benchmarks that the soil was required to meet in order to

be considered environmentally safe for use in a reclamation project such as the one

operated by Plaintiffs. Plaintiffs' argument fails to consider the substantial fact, and one that

it admits in its own papers, that the WABP fill was permitted to be deposited in an inactive

mine in Pennsylvania. The environmental regulations imposed by the PADEP applied

evenly to in and out-of-state competitors, and the only distinction made is between active

and inactive mines. Thus, Defendants' actions in its handling of the WABP fill were not

facially discriminatory, and the regulations imposed by the PADEP were facially neutral.

Plaintiffs admit that the PADEP's resources are scarce, and that the application

materials they provided to Defendants indicated the area from which the WABP fill was

being taken was surrounded by possible contaminants. Pennsylvania has a substantial,

important interest in protecting its environment and in enforcing its environmental

regulations. Any slight burden imposed on interstate commerce is incidental and dwarfed

by the Commonwealth's interest in protecting its environment from the harms that may arise

from fill that is to be placed in an active mine below the water table and which cannot be

verified as being free of contaminants.

Finally, Plaintiffs fail to allege that there is any in-state or out-of-state market

participant, that is, any disposer or receiver of clean fill, that would be discriminatorily

harmed by PADEP's policies. All similarly situated in-state facilities that accept clean fill are

required to abide by the applicable PADEP regulations regardless of the source of the fill.

41

The same policies govern out-of-state sources. Accordingly, Plaintiffs fail to state a claim under the Dormant Commerce Clause.

## D. Equal Protection

Count III of Plaintiffs' Complaint asserts an equal protection violation. (Pls.' Compl. at ¶¶ 184-88.) Although not specifically identified in the Complaint, both parties argue that Plaintiffs allege a "class-of-one" theory of equal protection. Plaintiffs allege that PADEP acted with discriminatory purpose by intentionally imposing a more stringent requirement on Pioneer for use and placement of the WABP fill than those which the PADEP required Coplay to abide by for use and placement of the exact same fill and that there was no rational basis for this differential treatment. (Pls.' Compl. at ¶¶ 185-186.)  Defendants argue that Plaintiffs have failed to allege an equal protection claim. Specifically, Defendants contend that Plaintiffs' "class of one" equal protection claim fails to allege (1) that Plaintiffs were treated differently by Defendants and (2) that the Coplay facility was similarly situated. (Defs.' Brief in Support of Mot. To Dismiss at 17.) Even if Plaintiffs do satisfactorily allege these elements, Defendants claim their actions had a rational basis which would account for any alleged disparity in treatment. (Id. at 18.)

Essentially, the Equal Protection Clause of the Fourteenth Amendment directs that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439, 150 S.Ct. 3249, 87 L.Ed.2d 313 (1985). There are two theories by which a plaintiff may assert an equal protection claim. Under the traditional theory, a

plaintiff may be protected from discriminatory treatment based on membership in a protected class such as gender or race. See, e.g., Cleburne, 473 U.S. at 440 (finding that mental retardation was not a suspect or quasi-suspect class). In contrast, a plaintiff that is not a part of a protected class may still have an equal protection claim under the "class of one" theory. See Village of Willowbrook v. Olech, 528 U.S. 562, 564 (2000). Since Plaintiffs' complaint does not allege that it belongs to any protected class, the Court will discuss Plaintiffs' claim under the class of one theory.

Under the "class of one" doctrine, a plaintiff may obtain relief for equal protection violations so long as a plaintiff alleges that he or she has been "intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." Willowbrook, 528 U.S. at 564. According to the Third Circuit, a plaintiff asserting a "class of one" claim "must allege that (1) the defendant treated him differently from others similarly situated, (2) the defendant did so intentionally, and (3) there was no rational basis for the difference in treatment." Hill v. Borough of Kutztown, 455 F.3d 225, 239 (3d Cir. 2006).

### 1. Similarly Situated

The first step in an equal protection analysis is to ascertain whether the plaintiffs were treated differently than similarly situated entities. Cleburne, 473 U.S. at 439; Melrose, Inc. v. City of Pittsburgh, 613 F.3d 380, 394 (3d Cir. 2010). Persons are similarly situated when "they are alike in all relevant aspects." Startzell v. City of Philadelphia, 533 F.3d 183,

203 (3d Cir. 2009) (internal quotations omitted). Plaintiffs pleaded that the Coplay facility was similarly situated and also allege that "other Mining District Offices imposed the less stringent Waste Clean Fill policy, such as the Moshannon District Office's November 28, 2005 approval of Glenn Hawbaker, Inc.'s proposed source for the Brooks Quarry." (Pls. Compl. at ¶ 187.)

Plaintiffs Complaint alleges that the Coplay mine is located approximately 70 miles from Pioneer's mine and that it is an "inactive mine" and thus regulated by the Bureau of Waste. Further, pursuant to an agreement with the PADEP, Coplay submitted an approval request for the WABP even though it was not required to do so by law. (Pls.' Compl. at ¶ 147).

Although this Court takes note of another district court's explication that "any two entities will look sufficiently dissimilar if examined at a microscopic level," *see Holt Cargo Sys., Inc. v. Delaware River Port Auth.*, 20 F. Supp. 2d 803, 826 (E.D. Pa. 1998), we cannot say that Plaintiffs sufficiently allege that the Coplay facility or the Glenn Hawbaker decision are similarly situated to Plaintiffs' facility. Defendants are correct in noting that the Coplay facility is an inactive mine and therefore regulated by a completely different bureau at the PADEP. Because of its status as an inactive mine, the Coplay facility is governed by a completely different legislative scheme than that of an active mine such as Pioneer. Plaintiffs argue that the fact that each bureau derives its authority from different statutes is irrelevant because both bureaus had the same purpose and followed the same standard for

governing the use of clean fill.  However, this reasoning does not overcome Plaintiffs' failure to sufficiently plead that Plaintiffs' facility is similarly situated.  With regard to the  Glenn Hawbaker decision, Plaintiffs only mention this decision once and fail to allege any facts regarding how this company was similarly situated or treated differently.  Further, Plaintiffs' Complaint specifically alleges that inconsistent applications of the clean fill standards were made by different district offices throughout the Commonwealth; thus, Plaintiffs' Complaint does not sufficiently allege that the particular Defendants named in the present action inconsistently applied clean fill regulations.   Accordingly, this Court cannot find that either the Coplay facility, or the Glenn Hawbaker site, is similarly situated in all relevant aspects.

## 2. *Rational Basis*

Even if Plaintiffs can maintain that they are similarly situated to others treated in a dissimilar and more favorable manner, their claim will still fail because the PADEP had a rational basis for denying their application to use a particular source of clean fill.[3]  Plaintiffs argue that the issue in the present case is irrational class legislation and that the classifications Defendants created among mines based on Mining Districts and inactive/active status are irrational.  Defendants argue that they have the authority to regulate active mines and therefore acted rationally in furtherance of a legitimate state interest, namely protecting the environment and water supply for the public by preventing them from putting fill of questionable cleanliness below the water table.

---

[2] Defendants' reliance on *MFS Inc. v. DiLazaro, 771 F. Supp. 2d 382, 434 (E.D.Pa 2011),* is inapposite because it dealt with selective enforcement of agency regulations.

"[R]ational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic'" of government activity. *See Holt*, 20 F. Supp. 2d at 825 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1990)); *see also FCC v. Beach Commns , Inc.*, 508 U.S. 307, 313 (1993) (holding that government actions will be found rational "if there is any reasonably conceivable state of facts" that could support it).

Defendants have extensive discretion in enforcing state environmental protection laws. Specifically, the Surface Mining Conservation and Reclamation Act, 52 P.S. § 1396.1 and the Noncoal Surface Mining Conservation and Reclamation Act, 52 P.S. § 3301 both provide Defendants with authority to regulate reclamation at active mine sites. Defendants gave Plaintiffs specific reasons as to why the clean fill at the WABP did not meet the regulatory requirements. Thus, in a February 27, 2009 letter to Pioneer, the PADEP denied Plaintiffs' request to use the WABP fill and provided the following justification:

> The Department has determined that the material from the Willis Avenue Bridge Project does not meet the definition of clean fill and is not approved for placement in the Pioneer Aggregates, Inc., Pioneer Quarry SMP No. 40060301. Soil and groundwater at the source site are extensively contaminated with metals and petroleum hydrocarbons. It cannot be proven or determined with any real certainty that the material to be placed on the mining permit is uncontaminated. Industrial and commercial sites likely to contain contaminated soils are unacceptable as clean fill sources.

Pls. Compl., Exh. C., at 7, ECF Dkt. 1-3.

Certainly protecting the Commonwealth's water supply would fall in the ambit of a reasonably conceivable set of facts to support their decision. Accordingly, we find that Defendants actions were rationally related to the legitimate state interest.

46

For the reasons stated above, this court grants Defendants motion to dismiss Count III of Plaintiffs' Complaint.

## III. COMMONWEALTH DOCUMENTS LAW

Count VI of Plaintiffs' Complaint asserts a violation of the Commonwealth Documents Law under 45 P.S. § 1102. (Pls.' Compl. at ¶¶ 206-215.) This law "sets forth an approval process for administrative regulations." (Pls.' Compl. at ¶ 207.) "This process includes certain content, notice, and filing requirements." (Pls.' Compl. at ¶ 208.) Specifically, Plaintiffs argue that the Mining Clean Fill standard is a *de facto* regulation and therefore not properly promulgated pursuant to the Commonwealth Documents law. (Pls.' Compl. at ¶ 215.) Further, the Commonwealth Court has original jurisdiction over all civil actions against the commonwealth government. 42 Pa. C.S.A. § 761(a)(1) (1986). Accordingly, this Court will decline to exercise supplemental jurisdiction over this lone state law claim as permitted by 28 U.S.C. § 1367(c)(3) ("(c) The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if -- . . . (3) the district court has dismissed all claims over which it has original jurisdiction").

## CONCLUSION

For the reasons set forth in this Memorandum Opinion, Plaintiffs' Complaint will be dismissed with prejudice. A separate Order will follow.

DATE: September 21, 2012

Robert D. Mariani
United States District Judge